IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JUDY RONELLER SHAW,                )
                                   )
            Plaintiff,             )
                                   )
     v.                            )   1:17CV91
                                   )
NANCY A. BERRYHILL,                )
Acting Commissioner of Social Security, )
                                   )
            Defendant.             )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Judy Roneller Shaw ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for Disability Insurance Benefits and Supplemental Security Income Benefits on August 4, 2011, alleging a disability onset date of February 2, 2010 in both applications. (Tr. at 58, 371-80.) Her applications were denied initially (Tr. at 170-86) and upon reconsideration (Tr. at 187-205). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 265-66.) Plaintiff, along with her attorney and an impartial vocational expert, attended

the hearing on May 29, 2013. (Tr. at 209.) The ALJ ultimately concluded that Plaintiff was not disabled. (Tr. at 231.) However, on January 29, 2015, the Appeals Council vacated the ALJ's decision and remanded the case for a new hearing. (Tr. at 238-39.) Following Plaintiff's second hearing, held on June 1, 2015, the ALJ again concluded that Plaintiff was not disabled within the meaning of the Act from her alleged onset date through September 25, 2015, the date of the administrative decision. (Tr. at 58-86.) On December 1, 2016, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[1]

---

[1] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[2] Step four then requires the ALJ to assess whether, based on

---

[2] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had engaged in "substantial gainful activity" between January 2012 and April 2012. However, because there was "a continuous 12-month period(s) during which [Plaintiff] did not engage in substantial gainful activity," the ALJ concluded that Plaintiff met her burden at step one of the sequential evaluation process for two separate periods: February 2010 through January 2012, and then May 2012 to September 25, 2015, the date of the decision. (Tr. at 60-61.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> Obesity, asthma, left shoulder adhesive capsulitis, reflex sympathetic dystrophy, complex regional pain syndrome, bipolar disorder, and posttraumatic stress disorder (PTSD).

(Tr. at 61.) The ALJ found at step three that none of these impairments met or equaled a disability listing. (Tr. at 62-64.) Therefore, the ALJ assessed Plaintiff's RFC and determined

5

that she could perform light work with further, non-exertional limitations. (Tr. at 64-65.) Specifically, the ALJ found that Plaintiff

> can occasionally reach with the left upper extremity, the dominant upper extremity; have occasional exposure to pulmonary irritants; she is able to understand and remember very short and simple instructions and sustain attention for two hour periods; she can [have] occasional interaction with coworker[s] and supervisors and no public interaction; she cannot perform tasks that require production pace or quota requirements; work decisions have to be standard and based on concrete circumstances.

(Tr. at 65.) Based on this determination, the ALJ found under step four of the analysis that Plaintiff could not perform any of her past relevant work. (Tr. at 84.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in the national economy. (Tr. at 84-85.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 86.)

Plaintiff now raises three challenges to the ALJ's decision. Specifically, she contends that the ALJ erred by (1) failing to give controlling weight to the opinion of her treating psychiatrist, Dr. Robert Millett, (2) failing to include all of her non-exertional limitations in the RFC or hypothetical question, and (3) failing to cite favorable material evidence and "displaying impermissible bias." After a thorough review of the record, the Court agrees that the ALJ's treatment of Dr. Millet's opinion merits remand. In light of this finding, the Court need not consider Plaintiff's additional contentions at this time.

A.   Treating physician opinion

Plaintiff first argues that the ALJ failed to properly weigh Dr. Millet's medical source opinions in accordance with 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c), better known as the

6

"treating physician rule." The Fourth Circuit has held that for claims, like Plaintiff's, filed before March 24, 2017, ALJs must evaluate medical opinion evidence in accordance with 20 C.F.R. §§ 404.1527(c) and 416.927(c) and the "treating physician rule" embodied within the regulations. Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). Under these regulations, "medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)); see also 20 C.F.R. § 416.927(a)(1). While the regulations mandate that the ALJ evaluate each medical opinion presented to her, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)); see also 20 C.F.R. § 416.927(c)(1). Thus, the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2); see also 20 C.F.R. § 416.927(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling 96–2p, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL

7

374188 (July 2, 1996) ("SSR 96–2p"); 20 C.F.R. § 404.1527(c)(2); see also Brown, 873 F.3d at 256; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.³ Instead, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion. Where an ALJ declines to give controlling weight to a treating source opinion, she must "give good reasons in [her] ... decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 416.927(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted).

In the present case, Dr. Millet completed a five page Medical Source Statement on June 2, 2015. (Tr. at 1438-42.) He indicated that Plaintiff's conditions include PTSD and bipolar disorder with symptoms including sleep disturbance, personality change, mood disturbance, emotional lability, pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt affect, illogical thinking or loosening of

---

³ For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

associations, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility and irritability. (Tr. at 1438.) Dr. Millet also specifically noted that Plaintiff "has suffered from unusual hostility [and] anger in [the] past," although this had improved with treatment. (Tr. at 1439.) When asked to provide clinical findings supportive of Plaintiff's diagnosis and symptomology, he responded that Plaintiff's symptom "severity has included suicidal ideation/homicidal ideation, depression, guilt/worthlessness, agitated, diminished pleasure, [and] sleep disturbances." (Tr. at 1439.) Dr. Millet then listed Plaintiff's medications as well as their side effects, which included "drowsiness, malaise, [and] lethargy" and opined that Plaintiff's impairments would cause her to be absent from work more than three times per month. (Tr. at 1439.)

The remainder of the source statement instructed Dr. Millet to rate Plaintiff's ability to perform various "basic mental activities of work on a regular and continuing basis" by checking one of four categories, defined as follows: (1) a rating of "no/mild loss" indicating "no significant loss of ability in the named activity; can sustain performance for 2/3 or more of an 8-hour workday;" (2) a rating of "moderate loss" indicating "some loss of ability in the named activity but still can sustain performance for 1/3 up to 2/3 of an 8-hour workday"; (3) a rating of "marked loss" indicating "substantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8-hour workday"; and (4) a rating of "extreme loss" indicating "complete loss of ability in the named activity; cannot sustain performance during an 8-hour workday." (Tr. at 1439.) In other words, "marked loss" indicates the ability to

9

perform an activity occasionally, while "moderate loss" indicates the ability to perform an activity frequently.

In terms of Plaintiff's ability to understand, remember, and carry out instructions, Dr. Millet opined that Plaintiff had a marked loss of the abilities to remember locations and work-like procedures; understand, remember, and carry out very short, simple instructions; and carry out detailed instructions. He also posited that she had a moderate loss of the ability to make simple work-related decisions. As for the eight remaining activities, Dr. Millet opined that Plaintiff was unable to perform any of them over the course of an 8-hour workday. These activities included the abilities to understand and remember detailed instructions, maintain attention and concentration for extended periods, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, deal with the stress of semi-skilled and skilled work, work in coordination with or proximity to others, complete a normal workday or workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 1440.)

Similarly, in terms of Plaintiff's ability to respond appropriately to supervision, coworkers, and work pressure, Dr. Millet posited that Plaintiff had no loss of the ability to adhere to basic standards of neatness and cleanliness, but marked loss of the abilities to ask simple questions or request assistance, respond appropriately to changes in a routine work setting, and be aware of normal hazards. In the remaining seven categories, he indicated extreme loss, including the total inability of Plaintiff to interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, get along with

10

coworkers and peers, maintain socially appropriate behavior, travel in unfamiliar places, use public transportation, and set realistic goals. (Tr. at 1441.)

When next asked to rate Plaintiff's degree of limitation in four broad functional areas, Dr. Millet opined that Plaintiff had a marked restriction in activities of daily living and extreme limitations in maintaining social functioning. He further posited that Plaintiff had constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner and continual episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from the situation or to experience an exacerbation of symptoms. (Tr. at 1441.) Finally, Dr. Millet asserted that Plaintiff's mental condition had "existed and persisted with the restrictions as outlined" above since October 1, 2012. (Tr. at 1442.) Thus, Dr. Millet's opinion covered the time period from October 1, 2012 through the date of the opinion, June 2, 2015.

The ALJ recounted much of Dr. Millet's opinion in her decision, but ultimately assigned it little weight. In doing so, she determined that the opinion "is not consistent with treatment notes and does not acknowledge [Plaintiff's] improvement with medication." (Tr. at 83-84.) The evidence does not support the functional limitations or work restrictions. This opinion appears to rely more heavily on [Plaintiff's] subjective complaints rather than objective treatment notes." (Tr. at 84.)

However, the ALJ's explanation of the weight given to Dr. Millet's opinion is conclusory and is not supported by substantial evidence. First, in rejecting Dr. Millet's opinion, the ALJ relied on treatment notes and other opinion evidence from 2010, 2011, and early 2012. However, Dr. Millet's opinion relates to the time period from October 1, 2012

11

through 2015. In the treatment records from late 2012 forward, every provider to treat Plaintiff at Carolina Behavioral Care, Dr. Millet's practice, noted ongoing mental symptoms causing a "significant adverse impact on social, occupational or family function." (Tr. at 782, 789, 795, 803, 808, 1120, 1125, 1136, 1142, 1164, 1173, 1178-79, 1185.) With respect to medication, the records from 2010 and 2011 do note improvement on Abilify. However, on November 1, 2012, Plaintiff reported that her medication was no longer helping, that she had not been sleeping, and that she "continues to be angry and have passive thoughts of harming herself and her [ex-boyfriend]." (Tr. at 816.) The records reflect ongoing issues with her medications, and in the latest treatment notes in the record in January, February, March, and April 2015, her providers are still trying to find the right combination of medications to treat her symptoms and avoid side effects. (Tr. at 1119, 1125, 1133, 1135, 1144, 1184, 1189.)[4]

Similarly, the objective evidence in the record is not inconsistent with Dr. Millet's opinion, and provides supporting evidence beyond just Plaintiff's subjective complaints. In this regard, the Commissioner contends that the ALJ "spent several pages of his decision recounting the psychiatric record, noting that Plaintiff showed continued improvement and generally benign findings while on medication." (Def.'s Br. [Doc. #15] at 5.) However, the

---

[4] The Court also notes that the record reflects that Plaintiff's failure to consistently take her medications was, at least in some instances, a result of her mental impairments and her inability to "tie current symptoms to missing appointments and running out of meds." (Tr. at 817.) One of the "goals" repeatedly reflected in her treatment notes is to "Take psychotropic medications as directed." The ALJ did not address or consider the extent to which her failure to maintain stability on her medications was a result of the mental impairments themselves. See Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse" and "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." (internal quotations omitted); Preston v. Heckler, 769 F.2d 988, 990-91 (4th Cir. 1985).

12

ALJ's "generally benign" description fails to fully include and address the evidence in the record for the period after October 1, 2012 addressed in Dr. Millet's opinion. Specifically, the record reflects that Plaintiff suffered from bipolar disorder, with manic episodes marked by extreme anger and violent outbursts. Plaintiff saw Dr. Millet on October 18, 2012 and was angry and irritable, and Dr. Millet noted that he would "try to avoid hospitalization by restarting meds at higher dose." (Tr. at 817-18.) The next month, on November 1, 2012, she reported that several nights before, her son found her outside the house standing completely naked in the middle of the road. (Tr. at 812.) She later reported that she had been hearing voices, had been barred from several grocery stores and other locations for threatening behavior, and that she had "killed her grandchildren's dog by choking it 'because it was getting on [her] nerves so bad.'" (Tr. at 807.) By November 14, 2012, her condition began to improve some, but she was still hearing voices (Tr. at 807), and she experienced a hypomanic episode with suicidal thoughts the next month, in December 2012. (Tr. at 802, 939, 1083.) Up to that point, she had worked part-time as a CNA caring for individuals in their homes, but she lost her job in December 2012 and did not work after that. (Tr. at 802.) In January 2013, she was still experiencing auditory hallucinations and depression. (Tr. at 794, 1083.) She also experienced side effects from her new medication regimen, including nausea, disorientation, and sleep disruption, leading her to discontinue and then restart various combinations of medications. (Tr. at 794, 799.) The next month, in February 2013, she was seen at Duke University Medical Center for severe depression, passive suicidal ideation, and active homicidal ideation. (Tr. at 939, 942, 945.) She reported that she had assaulted her former boyfriend and had attempted to stab him in the neck with a switch-blade and had also

13

attempted to assault him with a brick. (Tr. at 939, 942-45.) On March 1, 2013, Plaintiff was referred to the Duke University Medical Center Emergency Department. According to the treatment notes,

> [Plaintiff] endorse[d] homicidal ideations with a[n] intent and plan to kill her ex-boyfriend whom she perceives is "torturing her." [Plaintiff] has a[n] ongoing legal case related to an assault by this person on her in October of 2012. Since that time [s]he perceives that he is stalking her and breaking into her home. She has decided to get a restraining order against him. However it was declined. She expressed frustration and rage at this and she has decided to "get revenge." She has been following the ex-boyfriend and she has assaulted him 7 times or more over the past 2 months. She has [done] so with a hoodie and mask on. Thus her targeted individual does not know that it is she that has assaulted him. She . . . initially struck him with her fist once and ran away. However more recently she attempted to cut his neck with a switch blade. . . . She informed the medical resident that she did not strike with the knife due to a car that drove by at the moment of the attack. Given her past Hx of multiple assaults [>30] and her clear intent and plan she will be referred for inpatient hospitalization at this time.

(Tr. at 922; see also Tr. at 914, 917, 1081-87.) The records note auditory and visual hallucinations with an active intent to kill her ex-boyfriend. (Tr. at 917.) Significantly, the ALJ makes no reference to the nature of Plaintiff's involuntary commitment. Instead, she merely notes that Plaintiff "went to the hospital in March 2013, and when discharged, her mood and sleep were stable, her diminished pleasure or lack of interest was improving, she had improved guilt, and her irritation had resolved." (Tr. at 81.) However, this summary fails to fully reflect the extent of Plaintiff's psychiatric symptoms from October 2012 up to her involuntary commitment in March 2013. The ALJ later notes that Plaintiff "had situational exacerbation when she alleged her ex-boyfriend assaulted he[r]" but that her "homicidal ideations about him . . . subsided with the close of the case. After that, there were no desires to kill anyone in the record." (Tr. at 81.) However, this summary fails to fully reflect the extent of Plaintiff's

assaultive behavior and homicidal ideations, as recounted in Plaintiff's emergency department records. (Tr. at 914, 922, 939.) Plaintiff's records do reflect a period of improvement and relative stability in April and May 2013, after her hospitalization. However, approximately six months later, Plaintiff was back at the emergency department after assaulting a boyfriend with scissors. The boyfriend retaliated by assaulting her, and she ended up in the emergency department covered in his blood. (Tr. at 1335-37). She was discharged to the police and was taken to jail. (Tr. at 1319.) After a gap of several months in her records in early 2014, the records from August, September, October, and December 2014 reflect ongoing side effects from her medication, suicidal ideation, and ongoing homicidal ideation. (Tr. at 1144, 1147, 1158, 1163-64.) Plaintiff continued "feeling depressed, frustrated, and agitated" and "not sleeping well." (Tr. at 1158.) She had recently broken her wrist in a fall, but was so annoyed by the hard cast that she cut it off herself with a saw. (Tr. at 1158.) In October of 2014, notes from Duke Medicine reflect that Plaintiff was "[p]ositive for hallucinations, behavioral problems, sleep disturbance and dysphoric mood" and was "nervous/anxious." (Tr. at 1424.) Also in October 2014, Plaintiff reported to Susan Vebber, her new nurse practitioner at Carolina Behavioral Care, that she gets angry very easily and often stays isolated because of this. (Tr. at 1147.) Plaintiff also endorsed continuing depression, great difficulty sleeping more than 3-4 hours per night, still being bothered by homicidal ideations, and recent suicidal ideation when she went off her medications briefly in order to have dental work performed. (Tr. at 1147.) In particular, Plaintiff related that, when she doesn't take her medications regularly, "she has [recurring] thoughts of standing naked in front of a truck and letting it hit her." (Tr. at 1150-51.) A psychologist at Duke Medicine discussed with her the possibility of

15

inpatient psychiatric hospitalization in light of her hallucinations and the risk of becoming homicidal and manic while off her medications. (Tr. at 1429.) Ms. Vebber adjusted Plaintiff's medication regimen, and in December 2014, Plaintiff reported that these changes, along with biofeedback at Duke, had improved her mood, anxiety, and anger problems. (Tr. at 1141.) However, the new medication caused increased sleepiness, causing Plaintiff feel drowsy and nap during the day. (Tr. at 1135.) Ms. Vebber decreased Plaintiff's Depakote in an attempt to combat this problem (Tr. at 1139), but at her next appointment, Plaintiff indicated that this decrease caused her to hallucinate and feel angry again (Tr. at 1133). Notes from a January 2015 appointment at Duke Medicine note that Plaintiff was "[p]ositive for hallucinations, behavioral problems and dysphoric mood." (Tr. at 1408.) Adjustments were made and by March 2015, her anger had decreased, but she was "[s]till feeling too sleepy during the day with medication." (Tr. at 1119.) In particular, Plaintiff complained that it was "[e]xtremely difficult to get tasks completed in her day due to the problem with sleepiness." (Tr. at 1119.) In fact, Plaintiff's mental health treatment records repeatedly note concentration difficulties, both as a symptom of her PTSD and with respect to drowsiness as a side effect of her medications. (Tr. at 1119-20, 1126-29, 1135-36, 1142, 1148, 1185.) Ms. Vebber recounted that Plaintiff also had continued difficulty falling asleep at night, and although she tried decreasing Trazodone – yet another antidepressant—to remedy this issue, the medication change caused problems of its own. (Tr. at 1119.) Ms. Vebber therefore decreased Plaintiff's Abilify dosage and discussed the possibility of adding Modafanil (a wakefulness-promoting drug) and/or an antidepressant like Prozac in the future. (Tr. at 1123.) In Plaintiff's most recent records from Carolinas Behavioral Care, dated April 14, 2015, she continued to report

feeling "down, tired all the time[,] and sleeping [during] the day." (Tr. at 1189.) Ms. Vebber prescribed Prozac "to help with residual PTSD [and] depressive symptoms," but warned Plaintiff that it may increase her anger and agitation, and that she should discontinue the medication if this occurs. Ms. Vebber further noted that, if Prozac is not helpful, the next line of treatment may include Wellbutrin or Modafanil. (Tr. at 1189.)[5] At the time of the hearing, Plaintiff testified that her providers were still working on her medication regimen. (Tr. at 110.)

The above records clearly chronicle the ongoing adjustment of psychiatric medications by Plaintiff's providers to keep Plaintiff from decompensating, lashing out, or simply becoming too sedated to function. The ALJ, in contrast, simply stated that "[i]t took several medication changes to get the right combination, but [Plaintiff] has a positive response with all medication, [and] the dosage [just] needed adjusting." (Tr. at 81.) Moreover, the ALJ's overall account of Plaintiff's psychiatric treatment records suggests a fairly linear progression, minimizing accounts of severe episodes, including Plaintiff's 3-day psychiatric hospitalization, stalking, multiple (and sometimes mutual) assaults, banning from public places, and killing of her grandchildren's dog with bare hands. (Tr. at 81.) The ALJ then applied her "generally benign" version of events to find that Dr. Millet's opinion, which includes extreme limitations in social functioning and work related mental activities, is "not consistent with treatment notes" and "does not acknowledge [Plaintiff's] improvement with medication." (Tr. at 83-84.) In fact, Dr. Millet specifically noted that Plaintiff's "unusual hostility" and anger had improved with treatment. (Tr. at 1439.) However, he further opined that Plaintiff continued to

---

[5] Ms. Vebber subsequently completed her own Medical Source Statement, which was included in the record by the Appeals Council, setting out restrictions similar to those provided by Dr. Millet. (Tr. at 1453-57.)

experience symptoms and side effects which impaired or precluded her ability to perform basic work functions as set out in his Medical Source Statement. (Tr. at 1440-42.) Although the ALJ contends that "[t]he evidence does not support the functional limitations or work restrictions" in Dr. Millet's opinion (Tr. at 84), she provides no explanation as to which limitations she finds unsupported or how these restrictions conflict with the record evidence, particularly that from Dr. Millet's own practice. In short, the ALJ failed to "give good reasons in [her] . . . decision for the weight" assigned, taking the relevant factors in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) into account.

The ALJ's failure to adequately consider Dr. Millet's opinion is compounded by the lack of any other opinion evidence for the period in question. The ALJ assigned great weight to the opinions of Dr. Gibbs, a consultative examiner, and Drs. Grover and Nunez, both State Agency psychological consultants, as to Plaintiff's mental functioning during her alleged disability period. (Tr. at 82.) However, all three of these opinions predate the period considered by Dr. Millet, which began on October 1, 2012. (See Tr. at 645-47 (Gibbs, dated October 17, 2011); Tr. at 181-83 (Grover, dated January 19, 2012); and Tr. at 198-200 (Nunez, dated February 28, 2012).) As discussed in great detail above, Plaintiff's mental health treatment records recount a notable increase in her symptoms in late 2012. Plaintiff, who previously worked at least part time for short periods, no longer did so after this time, and instead began an extended period of poorly-controlled symptoms, myriad medication changes, multiple instances of violent, explosive behavior, and even involuntary commitment. The ALJ provided no discussion of separate time periods within the 5.5 years covered by her decision despite the significant changes in Plaintiff's condition, and despite the ALJ's own

18

determination that consideration of two separate periods was warranted in light of Plaintiff's continued work activity during early 2012. (Tr. at 60-61.) The ALJ did not enlist the assistance of a medical expert to review the more recent evidence or provide an opinion regarding the extent of Plaintiff's mental impairments for the later period, and as a result, no medical professional has reviewed the records or provided an opinion for the time period covered by Dr. Millet's treating physician opinion beginning October 1, 2012. Thus, the other opinion evidence from 2011 does not provide a basis for discounting Dr. Millet's opinion in this case.[6]

Finally, the Court notes that the Commissioner contends that Plaintiff was abusing cocaine at the time of the most violent conduct. (Def.'s Br. at 6.) In this regard, the record does reflect Plaintiff's use of cocaine at least to some point in late 2012, and Plaintiff also tested positive for cocaine at the time the second assault in December 2013. (Tr. at 1334.) However, the ALJ specifically concluded that Plaintiff's substance abuse was not a severe impairment. (Tr. at 62.) In the first decision in this case, the ALJ discounted some evidence due to Plaintiff's cocaine use (Tr. at 228), and on remand of that decision, the Appeals Council noted that the ALJ should further consider the maximum RFC and if Plaintiff is found disabled, then "conduct the further proceedings required to determine whether drug addiction is a contributing factor material to the determination of disability." (Tr. at 239.) In the second decision now before the Court, the ALJ elected not to undertake this analysis, and the evidence of Plaintiff's cocaine use cannot now be used as a *post hoc* rationalization to discount Plaintiff's

---

[6] Plaintiff similarly contends that the ALJ's decision fails to accurately reflect the later medical evidence regarding her physical impairments, specifically a March 18, 2013 MRI that Plaintiff contends reflects compression of the spinal cord. (Tr. at 912.) The Court need not consider this issue further at this time, given the need for a remand set out above.

behavior and the limitations reflected in the record. Any such analysis must instead be made by the ALJ in the first instance and must follow the regulatory requirements for making such a determination. See Social Security Ruling 13–2p, Titles II and XVI: Evaluating Cases Involving Drug Addiction and Alcoholism, 2013 WL 1221979 (Mar. 22, 2013).[7]

For all of these reasons, because substantial evidence ultimately fails to support the ALJ's treatment of the opinion evidence, this case requires remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #14] should be DENIED, and Plaintiff's Motion for Judgment on the Pleadings [Doc. #11] should be GRANTED. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 14th day of March, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[7] The Court notes that there may be significant issues in this case regarding Plaintiff's cocaine use, as well as misuse of prescription opiod medication reflected in the ALJ's decision. It is not clear if Dr. Millet was aware of these issues, and it may be that even if Plaintiff would be disabled taking all of the evidence into account, she would not be disabled if she ceased the substance abuse. However, as noted above, that is a determination to be made by the ALJ using the analysis set out in SSR 13-2p.